STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT
18-398 consolidated with 18-399

JOSEPH KOLWE, JR.

VERSUS

CIVIL AND STRUCTURAL ENGINEERS, INC.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2016-1792-B
HONORABLE JULES D. EDWARDS, III, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
D. Kent Savoie, Judges.

**AFFIRMED AS AMENDED.**

Steven G. Durio
Travis J. Broussard
Durio, McGoffin, Stagg & Ackermann
P. O. Box 51308
Lafayette, LA 70505-1305
Telephone:  (337) 233-0300
COUNSEL FOR:
　　　Plaintiff/Appellant - Joseph Kolwe, Jr.

Donald W. Washington
Kyle M. Bacon
Jones Walker LLP
P. O. Box 3408
Lafayette, LA 70502
Telephone:  (337) 593-7600
COUNSEL FOR:
　　　Defendant/Appellee  Civil and Structural Engineers, Inc.

**Mark D. Plaisance**
**Marcus J. Plaisance**
**Plaisance Law, LLC**
**P. O. Box 1123**
**Prairieville, LA 70769**
**Telephone:  (225) 775-5297**
**COUNSEL FOR:**
    **Plaintiff/Appellant - Joseph Kolwe, Jr.**

**THIBODEAUX, Chief Judge.**

These consolidated appeals entreat us to consider *res nova* issues of law interpreting the recently revised Louisiana Business Corporation Act ("LBCA"), La.RS. 12:1-101, *et seq*.

Plaintiff Joseph Kolwe, Jr. is a withdrawing shareholder of Defendant-Appellee, Civil and Structural Engineers, Inc. ("CASE"). He appeals a final judgment of the trial court which fixed the fair value of his shares at contradictory amounts of $871,817.00 and $587,187.00. The judgment was then amended *sua sponte* by the trial court to a decisive figure of $871,817.00. This Amended Judgment now forms the subject of Mr. Kolwe's consolidated appeals, whereby he challenges its validity pursuant to La.Code Civ.P. art. 1951. Mr. Kolwe additionally contends the trial court erred in its conclusion of his effective date of withdrawal from CASE and also in its failure to award interest on the amount of his shares as valued.

CASE answers the appeal challenging the trial court's determination of the fair value of Mr. Kolwe's shares in the corporation. Specifically, it asserts that the trial court erred in declining to tax-effect Mr. Kolwe's shares, in including proceeds of a settled claim awarded to CASE in its valuation determination, and in allegedly refusing to consider evidence of undue burden pursuant to La.R.S. 12:1-1436(E).

For the reasons set forth below, we amend the original judgment to conform to the statutory framework contemplated by the LBCA and, as amended, affirm.

## I.

## ISSUES

We must decide:

(1)     whether the Amended Judgment on Rules issued by the trial court on January 4, 2018, is an absolute nullity pursuant to La.Code Civ.P. art. 1951 and, if so, whether the Original Judgment on Rules signed on December 22, 2017, may be revised to correct any errors of substance or, alternatively, any errors in calculation or phraseology;

(2)     whether the trial court erred in determining the effective date of Mr. Kolwe's Notice of Withdrawal to be November 29, 2015;

(3)     whether the trial court erred in its determination of the "fair value" of Mr. Kolwe's interest by failing to tax-effect the value of his shares and/or including the BP settlement payment in its valuation;

(4)     whether the trial court erred in failing to award Mr. Kolwe judicial interest and costs from the date of judicial demand; and

(5)     whether the trial court abused its discretion in refusing to hear evidence pertaining to La.R.S. 12:1-1436(E) at the conclusion of the valuation trial.

## II.

## FACTS AND PROCEDURAL HISTORY

CASE is a professional engineering firm operating as a closely-held business corporation. Its three shareholders, Michael Smith, Matthew Granberry, and Joseph Kolwe, Jr., each owned an equal one-third share until December 2017. Prior to Mr. Kolwe's disassociation from the corporation, each shareholder served as an employee and officer of CASE, and the three together comprised the board of directors.

2

After employment-related disputes arose concerning Mr. Kolwe's performance, discussions regarding his departure from CASE commenced in December of 2014. In early 2015, CASE began negotiating a buy-out of Mr. Kolwe's ownership interest and retained a business valuation expert, Jason MacMorran, to facilitate the transaction; Mr. Kolwe likewise retained his own expert, Charles Theriot, to protect his interests. By mid-2015, however, the shareholders were unable to amicably resolve the terms of Mr. Kolwe's withdrawal.

In November of 2015, Mr. Kolwe received notice of a special meeting of the board of directors to be held for the purpose of considering a profitability incentive plan for employees and directors of CASE. After receiving notice of the meeting, Mr. Kolwe's attorney drafted and mailed a notice of withdrawal to the corporation pursuant to La.R.S. 12:1-1435, *et seq*. At the board meeting, the profitability incentive plan was adopted despite Mr. Kolwe's objection. At the end of November, Mr. Kolwe's employment with CASE was terminated, and, over the course of the next month, he was removed as both an officer and director of the corporation.

On December 2, 2015, Mr. Kolwe filed suit against CASE, Mr. Smith, and Mr. Granberry alleging claims of shareholder oppression. However, this suit was ultimately dismissed after the trial court sustained the defendants' Exceptions of No Cause of Action and Prematurity.

On April 6, 2016, Mr. Kolwe reasserted his claims of oppression against CASE, Mr. Smith, and Mr. Granberry. After disagreements continued regarding the value of Mr. Kolwe's ownership interest, the parties agreed to bypass a trial on the merits of the oppression claims and simply litigate the valuation issue

by summary proceeding in accordance with La.R.S. 12:1-1436. Upon joint request of the parties, the trial court signed a Consent Judgment and Order of Trial Date which ordered that a trial be held for the limited purposes of valuing Mr. Kolwe's shares and determining the effective date of his notice of withdrawal.[1] Prior to the valuation trial, CASE filed a Motion for Partial Summary Judgment regarding the effective date of Mr. Kolwe's withdrawal. On November 20, 2017, the trial court granted the motion and held Mr. Kolwe's notice of withdrawal to corporation was effective as of November 29, 2015.

A valuation trial was held on December 20-21, 2017, and a final judgment was rendered in the matter on December 22, 2017, purporting to declare the value of Mr. Kolwe's shares and affirming its earlier ruling as to the effective date of Mr. Kolwe's notice of withdrawal. In reaching its valuation determination, the trial court declined to "tax-effect"[2] the value of the corporation's unaccrued net assets as argued for by CASE, and included the proceeds of a settled BP claim in the valuation as argued against by CASE.

However, the final judgment contained an internal inconsistency regarding the dollar figure amount of Mr. Kolwe's interest, and the trial court thereafter issued an amended judgment on January 4, 2018, to correct the inconsistency. On appeal, however, Mr. Kolwe asserts that the amended judgment is absolutely null and, thus, seeks to reinstate the original judgment because of the trial court's failure to afford the proper hearing with notice to the parties prior to

---

[1]As stipulated in the judgment itself and per La.R.S. 12:1-1435(E), the Consent Judgment expressly acknowledged that "neither this Judgment nor the parties' submission of it, or consent to it, operates as any admission, or as any evidence, that Defendant Civil and Structural Engineers, Inc. has engaged in any oppression of Plaintiff Joseph Kolwe, Jr."

[2]The terms "tax-effect" and "tax-affect" both appear in the literature on this subject. For the sake of consistency, we will use "tax-effect." In direct quotes, we will follow the language as reported.

correcting its error of substance in the original judgment. Next, Mr. Kolwe argues that the effective date of his notice of withdrawal was November 24, 2015, despite the trial court's ruling that his notice of withdrawal was effective five days later, as of November 29, 2015. Whereas the effective date of Mr. Kolwe's withdrawal from the corporation dictates the fair value of his ownership interest in CASE, the parties raise several arguments on appeal with respect to both procedural and substantive aspects of the trial court's valuation determinations.

III.

## STANDARD OF REVIEW

"[A]ppellate jurisdiction of a court of appeal extends to law and facts." La.Const. art. 4, § 10(B). The appellate court must determine whether the trial court committed an error of law or made a factual finding that was manifestly erroneous or clearly wrong. *Gibson v. State*, 99-1730 (La. 4/11/00), 758 So.2d 782, *cert denied*, 531 U.S. 1052, 121 S.Ct. 656 (2000). The reviewing court must review the record in its entirety to make this determination. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993).

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Id.*; *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The trial court's valuation of a withdrawing shareholder's ownership interest is a factual one which shall not be disturbed absent manifest error. *Ellington v. Ellington*, 39,943 (La.App. 2 Cir. 3/18/03), 842 So.2d 1160. Accordingly, if the trial court's findings in a valuation proceeding are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. "Furthermore, the trial court's choice of one

5

expert's method of valuation over that of another will not be overturned unless it is manifestly erroneous." *Id.* at 1166.

However, the interpretive aspect of this case presents this court with a question of law and is, thus, reviewed under a de novo standard of review. *Caldwell v. Janssen Pharmaceutical, Inc.*, 12-2447 (La. 1/28/14), 144 So.3d 898. While it is well settled that a reviewing court will defer to a trial court's reasonable decision on a question properly within its discretion, such deference shall not be afforded where its decision is based on an erroneous interpretation or application of law rather than a valid exercise of discretion. *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067 (La.1983).

## IV.

## LAW AND DISCUSSION

### Amendment of Final Judgment

On December 22, 2017, the trial court issued its Judgment on Rules following a two-day valuation trial ("Original Judgment"). However, the judgment contained an internal inconsistency with respect to the dollar figure amount of Mr. Kolwe's ownership interest in the corporation.[3] In an earlier portion of the judgment located under the subheading JUDGMENT, the trial court stated: "This court adjudges declares and decrees [sic] the plaintiff's shares as of November 29,

---

[3]In issuing its "Judgment on Rules," the trial court failed to keep separate and distinct the judgment itself from its written reasons for judgment. "A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment." La.Civ.Code art. 1918.

However, this court has held that this statute is not to be applied mechanically and likewise will not operate to automatically nullify a judgment so long as the essentials of a judgment are present. *Barlow v. Barlow*, 13-1092 (La.App. 3 Cir. 10/23/13), 161 So.3d 24. Despite the trial court's disregard for the statute, we shall nevertheless regard the judgments issued as valid.

6

2015 to be $587,178.00." In its conclusion, however, the trial court went on to state: "Accordingly, this court finds that the plaintiff's ownership interests in CASE shares as of November 29, 2015 to be valued to be $871,817.00."

On January 4, 2018, the trial court issued an Amended Judgment on Rules ("Amended Judgment") *sua sponte*. Without providing a hearing with notice to the parties, the trial court deleted its language decreeing Mr. Kolwe's interest to be worth $587,178.00. Consistent with the Original Judgment, the Amended Judgment valued Mr. Kolwe's shares to be $871,817.00.

Mr. Kolwe now argues before this court that the Amended Judgment rendered on January 4, 2018, ought to be declared an absolute nullity pursuant to La.Code Civ.P. art. 1951. Louisiana Code of Civil Procedure Article 1951 provides the following:

> On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment, but not its substance, or to correct errors of calculation. The judgment may be amended only after a hearing with notice to all parties, except that a hearing is not required if all parties consent or if the court or the party submitting the amended judgment certifies that it was provided to all parties at least five days before the amendment and that no opposition has been received.

He asserts that while the trial court clearly intended to value his interest to be worth $871,817.00, as demonstrated by the Amended Judgment's deletion of the decretal reference to the $587,187.00 figure contained in the Original Judgment, the deletion constitutes an amendment to the substance of the final Original Judgment rendered by the trial court, in violation of La.Code Civ.P. art. 1951. Finding that this alteration of the final judgment regarding the fair value amount

7

not only affects the substance of the judgment, but also directly injects uncertainty into the very objective to be attained by the valuation trial, we agree.

While the usual remedy of this court in such a case is to vacate the amended judgment and reinstate the original judgment, this case will not be resolved by such a remedy. *See Tunstall v. Stierwald*, 01-1765 (La. 2/26/02), 809 So.2d 916. To reinstate the Original Judgment here would allow a judgment to stand which contains an internal inconsistency regarding the value of Mr. Kolwe's shares, which would, thus, defeat the sole objective of the valuation trial. Pursuant to La.Code Civ.P. art. 2164, an appellate court may "render any judgment which is just, legal and proper upon the record on appeal." Accordingly, based on the complete record before us, we deem it just, legal and proper not only to vacate the Amended Judgment and reinstate the Original Judgment, but also to revise the Original Judgment to reflect the clear intent of the trial court to value Mr. Kolwe's ownership interest in the amount of $871,817.00 as of November 29, 2015.[4]

Accordingly, Mr. Kolwe's ownership of any interest and any corresponding rights and obligations as a shareholder in CASE will be deemed to have terminated as of the date of the issuance of the Original Judgment, on December 22, 2017.[5]

---

[4] Our review of the record reveals that both judgments state, "[t]hus, the plaintiff's valuation of that asset is adopted by this court as its value on November 29, 1995." Although likely an oversight on the part of the trial court, this error was not corrected in the Amended Judgment; we have now done so.

[5] In his brief, Mr. Kolwe assigned as error the trial court's failure to state a "separation date" in its final judgment after valuing his interest. A plain reading of the statute indicates when a withdrawing shareholder's status and corresponding rights as a shareholder terminate, and, thus, we find that the trial court did not err where it was not required to state such a date in light of the relevant statutory guidance.

In the case that a contract of sale is formed by the corporation delivering written notice of its acceptance of withdrawing shareholder's offer to sell under La.R.S. 12:1-1435(F), the shareholder's status and rights cease upon consummation of the contract, that is to say when

Additionally, CASE raises a separate error of the trial court in rendering its final judgment. It asserts that the trial court erred in its failure to render a portion of the judgment in favor of CASE and against Mr. Kolwe, as required by La.R.S. 12:1-1436(D). We agree, and likewise revise the Original Judgment, as amended above, to conform with the statutory requirements of the LBCA pursuant to the authority conferred upon this court in La.Code Civ.P. art. 2164.

Louisiana Revised Statutes 12:1-1436(D) (emphasis added) provides, in pertinent part, that

> [A]t the conclusion of the trial the court *shall* render final judgment as described in Paragraphs (1) *and* (2) of this Subsection:
>
> (1)    In favor of the shareholder and against the corporation for the fair value of the shareholder's shares.
>
> (2)    *In favor of the corporation and against the shareholder that does both of the following*:
>
> (a)    Terminates the shareholder's ownership of shares in the corporation.
>
> (b)    Orders the shareholder to deliver to the corporation within thirty days of the date of the judgment any certificate issued by the corporation for the shares or an affidavit by the shareholder that the certificate has been lost, stolen, destroyed, or previously delivered to the corporation.

---

delivery of the corporation's notice of acceptance becomes effective. *See* Douglas K. Moll, *Shareholder Oppression and the New Louisiana Business Corporation Act*, 60 Loy. L. Rev. 461 (2014).

In the case where no such contract of sale is formed, however, and the shareholder enforces "the right to pursue a court-ordered purchase and sale" instead, as here, Official Comment (k) provides that "the shareholder remains a shareholder in the company until the court-ordered transaction is consummated as provided in R.S. 12:1-1436(C) or until the shares are transferred in some other fashion." When Subsections (C) and (D) of La.R.S. 12:1-1436 are read *in pari materia*, it is clear that the withdrawing shareholder retains his rights and status until the court determines the fair value of the shares and renders its final judgment in the valuation proceeding.

In both judgments, the trial court concluded its written reasons by stating the following:

> In accordance with the provisions of La.R.S. 12:1-1436(D), this is a final judgment is [sic] rendered in favor of plaintiff Joseph Kolwe, Jr. and against defendant Civil and Structural Engineers, Inc. This judgment terminates the plaintiff's ownership shares [sic] in Civil and Structural Engineers, Inc. The plaintiff is ordered to deliver to CASE, Inc., any certificate issued by CASE for the shares or an affidavit that the certificate has been lost, stolen destroyed [sic] or previously delivered to the corporation, within thirty days of the date of this judgment.

As stated above, La.Code Civ.P. art. 1951 provides that a court may, on its own motion, amend a final judgment at any time to correct the phraseology of a judgment. Thus, La.Code Civ.P. art. 1951 allows that a "judgment may be amended by the court where the amendment takes nothing from or adds nothing to the original judgment." *Villaume v. Villaume*, 363 So.2d 448, 450 (La.1978).

The judgments explicitly rule in favor of Mr. Kolwe as shareholder and against the CASE, per Subsection (D)(1), but likewise fail to include language explicitly ruling in favor of the corporation and against the shareholder, as required by Subsection (D)(2). While we recognize that the trial court's holding comports with the statute's requirement in effect through featuring language that terminates Mr. Kolwe's ownership of shares and orders him to deliver any certificate or affidavit to the corporation, we further amend the phraseology of Original Judgment to explicitly reflect the statutory directive for the judicial determination of fair value as contemplated by La.R.S. 12:1-1436(D), specifically Subsection (D)(2), where to do so would neither add nor take something away from the substance of the judgment.

10

**Effective Date of Notice of Withdrawal**

On appeal, Mr. Kolwe asks this court to determine whether the trial court erred in declaring that the effective date of his notice of withdrawal to the corporation was November 29, 2015, rather than November 24, 2015, as he maintains. For the following reasons, we decline the arguments advanced by Mr. Kolwe and affirm the trial court's determination that Mr. Kolwe's notice of withdrawal to the corporation became effective as of November 29, 2015.

On November 21, 2015, a notice of special meeting of the board of directors of CASE was timely mailed to Mr. Kolwe per the corporate by-laws, informing him of a special meeting to be held on the morning of November 25, 2015. The board meeting notice was delivered to Mr. Kolwe's mailbox on November 23, 2015, at 1:23 p.m., as indicated by the return receipt. On the afternoon of November 24, 2015, following his receipt of the board meeting notice, Mr. Kolwe's attorney, Travis Broussard, prepared a letter asserting that Mr. Kolwe was withdrawing as a shareholder of CASE pursuant to La.R.S. 12:1-1435, *et seq.* The letter was addressed to Michael Smith as president of CASE, and sent by U.S. mail to be delivered to the address of the corporation's principal office as indicated in the corporate records. However, the letter was never actually received by the corporation.[6]

At or around the same time, Mr. Broussard's secretary drafted and sent an email to Kyle M. Bacon, an attorney representing Mr. Smith and Mr. Granberry as majority shareholders and directors of CASE. The email stated: "Attached please find a letter from Mr. Broussard directed to Civil and Structural

---

[6] After being asked in a deposition whether CASE had ever received a notice of withdrawal that was purportedly stuck in the mail on November 24, 2015, Mr. Granberry testified, "[n]o, we have not."

11

Engineers, Inc., regarding the above-referenced matter, which was sent via U.S. Mail today."[7]

At all pertinent times, Mr. Kolwe has argued that the email sent to Mr. Bacon constituted notice by electronic transmission pursuant La.R.S. 12:1-141, and further that notice to Mr. Bacon constituted sufficient, legal notice to the corporation. Mr. Kolwe alternatively argued that because the notice of withdrawal was mailed to a shareholder of CASE pursuant to La.R.S.12:1-141(I)(2), the notice was effective upon deposit in the U.S. Mail. On November 20, 2017, the trial court granted CASE's Partial Motion for Summary Judgment and found that "there is no genuine issue of material fact that notice of withdrawal was mailed on November 24, 2015, to the address of the business. Notice is effective five (5) days thereafter, which was November 29, 2015." On appeal, we find Mr. Kolwe's arguments to be neither compelling nor applicable to the instant situation as reasserted before this court.

Louisiana Revised Statutes 12:1-1435 governs the procedure affording an oppressed shareholder the right to withdraw from a corporation. At the outset, the statute dictates that "the value of a withdrawing shareholder's shares is to be determined as of the effective date of the notice of withdrawal." La.R.S. 12:1-1435(C)(1). The statute further indicates that "[a] shareholder may assert a right to withdraw under this Section by giving written notice *to the corporation* that the shareholder is withdrawing from the corporation on grounds of oppression." La.R.S. 12:1-1435(D) (emphasis added). Therefore, in addition to the requirements that notice be written and specify that the shareholder withdraws

---

[7] Though the emailed letter at issue references the inclusion of an attachment titled "Withdrawl [sic] letter 112415.pdf", we note here that the attachment itself was not included in the record on appeal and, thus, may not be considered in any event.

12

on grounds of oppression, the statute explicitly mandates that a shareholder direct his or her notice of withdrawal to the corporation.

While La.R.S. 12:1-1435 does not contain any formal requirements for effectuating notice particular to oppressed shareholders, the "effective date of notice" is defined in La.R.S. 12:1-141. La.R.S. 12:1-140(7). That statute provides that "[n]otice or other communication to a domestic…corporation…may be delivered to its registered agent or to the secretary of the corporation at its principal office." La.R.S. 12:1-141(C). Alternatively, the statute also permits that such notice "may be delivered by electronic transmission if consented to by the recipient or if authorized by Subsection J of this Section."[8] Subsection (J) goes on to provide the following:

> J. A notice or other communication may be in the form of an electronic transmission that cannot be directly reproduced in paper form by the recipient through an automated process used in conventional commercial practice only if all of the following requirements are met:
>
> (1) The electronic transmission is otherwise retrievable in perceivable form.
>
> (2) The sender and the recipient have consented in writing to the use of such form of electronic transmission.

La.R.S. 12:1-141(J).

---

[8]Louisiana Revised Statutes 12:1-140(7C) provides:

> "Electronic transmission" or "electronically transmitted" means any form or process of communication, not directly involving the physical transfer of paper or another tangible medium, that is both of the following:
>
> (a) Suitable for the retention, retrieval, and reproduction of information by the recipient.
>
> (b) Retrievable in paper form by the recipient through an automated process used in conventional commercial practice, unless otherwise authorized in accordance with R.S. 12: 1-141(J).

While Mr. Kolwe maintains that the email sent by Mr. Broussard's secretary to Mr. Bacon constitutes notice by electronic transmission, we disagree for several reasons. First, any notice, regardless of form, given to Mr. Bacon cannot be deemed effective as notice to the corporation. While La.R.S. 12:1-141(C) provides that notice to the corporation may be effected upon either its registered agent or its secretary, Mr. Bacon served in neither capacity for CASE. Moreover, even if Mr. Bacon were authorized to receive notice on behalf of the corporation, there is no evidence that Mr. Bacon gave his consent to Mr. Kolwe, written or otherwise, to receive any electronic communication from him under Subsection (J). To this point, Mr. Kolwe relies on a letter dated September 1, 2015, in which Mr. Bacon stated the following:

> I am sending this letter in my capacity as counsel for the majority shareholders and majority directors of Civil and Structural Engineers, Inc. ("CASE"), Mike Smith and Matt Granberry. If you are represented by an attorney, please notify me immediately, and I will direct all future communications to your attorney.

In our review, nothing contained in the above language suggests that Mr. Bacon gave, or otherwise indicated, his consent to receive notice on behalf of the corporation electronically. Therefore, we find this argument to be without merit.

Though more persuasive, Mr. Kolwe's alternative argument that notice was effective upon deposit in the U.S. mail likewise fails. He asserts that because the notice was addressed to Michael Smith, the corporate president and a shareholder, the notice consequently ought to be effective on the date of its alleged deposit on November 24, 2015. In examining the plain language of the statute, however, we must disagree with Mr. Kolwe's interpretation.

In more pertinent part, the relevant statutory provision relied upon by Mr. Kolwe provides:

> I.   Notice or other communication, if in a comprehensible form or manner, is effective at the earliest of the following:
>
> . . . .
>
> (2)   If mailed by United States mail postage prepaid and correctly addressed to a shareholder, upon deposit in the United States mail.
>
> (3)   If mailed by United States mail postage prepaid and correctly addressed to a *recipient other than a shareholder*, the earliest of the following:
>
> > (a)  The date when actually received.
> >
> > (b)  If sent by registered or certified mail, return receipt requested, the date shown on the return receipt signed by or on behalf of the addressee.
> >
> > (c)  Five days after it is deposited in the United States mail.

La.R.S. 12:1-141(I) (emphasis added).

While Mr. Smith was indeed a shareholder of the corporation, Mr. Kolwe's argument attempts to unduly circumvent the procedural scheme set forth by the withdrawal provisions in La.R.S. 12:1-1435, *et seq.* by relying on the general notice statute which governs all communications by a variety of actors across numerous types of business entities in this state.[9] As mentioned previously, La.R.S. 12:1-1435(D) allows Mr. Kolwe to "assert a right to withdraw *under this Section* by giving written notice *to the corporation*. . ." (emphasis added).  A plain

_____

[9]Indeed, Mr. Kolwe's interpretation violates a fundamental tenet of statutory construction: that laws on the same subject matter must be interpreted in reference to each other, and that when faced with conflicting statutory provisions, the more specific will control over the general. La.Civ.Code art. 13; *Thompson Tree & Spraying Serv. Inc. v. White-Spunner Const., Inc.*, 10-1187 (La.App. 3 Cir. 6/1/11), 68 So.3d 1142, *writ denied*, 11-1417 (La. 9/30/11), 71 So.3d 290.

reading of the withdrawal statute *in pari materia* with the general notice statute suggests that while a shareholder may assert his right to withdraw by giving written notice to a registered agent or secretary of the corporation, giving such notice to a shareholder solely on the basis of being a shareholder is not contemplated by the withdrawal provisions.[10]

In reviewing the facts, Mr. Kolwe's withdrawal notice was addressed to "Michael Smith, president" and listed the mailing address of the corporation's principle office, rather than the separate mailing address listed for Michael Smith in his capacity as registered agent in the corporate records. Moreover, in discussing the issue of notice in his brief, Mr. Kolwe correctly identified that "[t]he proper purchaser of Kolwe's interest was the corporation, not the remaining shareholders." Though we find these facts not completely dispositive, it appears that Mr. Kolwe properly directed his right to withdraw to the corporation in accordance with the very statute defining his remedy.

Furthermore, the mailed notice of withdrawal was never received by the corporation in this case and the record does not indicate that Mr. Kolwe's notice was sent by registered or certified mail. Thus, the effective date of Mr. Kolwe's notice necessarily falls under La.R.S. 12:1-141(I)(3)(c), which is five days after it was deposited in the U.S. mail.

As such, we find no manifest error in the trial court's determination that Mr. Kolwe's notice of withdrawal became effective on November 29, 2015. Consequently, Mr. Kolwe's shares ought to be valued as of that date.

---

[10]We also find persuasive CASE's argument that while the legislature provides several instances in which notice is required to be sent to a shareholder, this is not one of those instances. *See* La.R.S. 12:1-704 (notice of corporate action to nonvoting shareholders), La.R.S. 12:1-1340 (notice to shareholders of corporation's waiver of appraisal rights), and La.R.S. 12:1-630 (notice to shareholders in connection with a director's conflicting interest transaction) for illustrative purposes.

## Trial Court's Determination of "Fair Value"

At the valuation trial, each party presented competing expert testimony as to the estimated value of Mr. Kolwe's ownership interest in CASE. While both experts agreed that the net asset approach was the proper approach in rendering their respective opinions, they disagreed as to whether certain adjustments should be made to the corporation's book value. Specifically, two main points of disagreement arose: first, whether the corporation's accounts receivables should be adjusted, or "tax-effected," to reflect the tax liability that would accrue upon their collection, and second, whether certain proceeds of a settled BP claim awarded to the corporation were "known or knowable" as of the date of Mr. Kolwe's withdrawal such that they ought be included in the valuation.

As a result, the experts' calculations differed significantly. CASE's valuation expert, Jason MacMorran, argued that while tax-effecting should be allowed in this case, the settlement proceeds should not be included in the valuation. Thus, after discounting the value of CASE's estimated future tax liability, he opined that Mr. Kolwe's shares were worth $587,178.00. Conversely, Mr. Kolwe's expert, Charles Theriot, argued that tax-effecting was inappropriate in this context and that because the proceeds to be received from the settlement were "known or knowable" as of the date of Mr. Kolwe's withdrawal, his shares were worth $871,817.00. It is undisputed that the difference between the figures reached was equivalent to the estimated tax liability (a $252,580.00 value), and what would be Mr. Kolwe's share of the proceeds from the BP claim (a $31,666.00 value).

After hearing the expert testimony of both parties, the trial court accepted Mr. Kolwe's valuation estimate and declared that the fair value of his

ownership interest was worth $871,817.00 as of November 29, 2015, the effective date of his notice of withdrawal. In rendering its valuation, the trial court explicitly rejected CASE's argument supporting a discount of the corporation's assets to account for future tax liability. It stated, "the logic of CASE's argument suggest [sic] any reduction of the valuation for tax-effecting would result in a discount for the two remaining shareholders and double taxation for the plaintiff; therefore, this court finds that tax-effecting the unaccrued net assets is inappropriate in this case." As to the proceeds of the BP claim, the trial court expressly determined that because "that asset was in fact known and a value of that asset was knowable" as of the date of Mr. Kolwe's withdrawal, and, thus, the date his shares are to be valued, that those proceeds be included in the valuation of his interest.

On appeal, CASE challenges the trial court's determination of the "fair value" of Mr. Kolwe's ownership interest. Specifically, it alleges that the trial court's failure to tax-effect CASE's accounts receivables and its inclusion of the BP settlement proceeds in its valuation erroneously inflated the value of Mr. Kolwe's shares by approximately $284,000.00.

Before ruling on this issue, however, our review reveals that CASE's reasoning as to the applicability of certain adjustments, particularly with respect to tax-effecting, necessarily follows its flawed interpretation of "fair value" as contained in the newly revised and reenacted La.R.S. 12:1-1435(C)(2) and 12:1-1301(4). While the trial court's ultimate determination of fair value is a question of fact, the determination of whether a given fact is relevant to fair value under La.R.S. 12:1-1435(C)(2) and 12:1-1301(1) is a question of law which we review de novo. Here, CASE argues that the future tax liability to be accrued by the

18

corporation (but eventually passed-through to the shareholders personally) once its accounts receivable are collected upon reduces the value of those receivables to a hypothetical buyer, and is, thus, a relevant fact which ought to discount the value of Mr. Kolwe's ownership interest. However, because the reduction of the value of the corporation to account for Mr. Kolwe's share of future tax liability follows directly from the concept of "fair market value," rather than the legislature's explicit and distinct statutory standard of "fair value" which expressly rejects the applicability of discounts, we disagree with CASE's interpretation in light of the clear statutory language.

The Meaning of "Fair Value"

The primary question in interpreting applicable statutory law is one of legislative intent and the ascertainment of the reasons that prompted the legislature to enact the law. *Caldwell*, 144 So.3d 898. It remains a fundamental principle of statutory interpretation that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature." *Id*.; La.Civ.Code art. 9. "However, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole, and laws on the same subject matter must be interpreted in reference to each other." *Id*.; La.Civ.Code arts. 12 and 13; La.R.S. 1:3. As our supreme court has elaborated,

> The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the Legislature in enacting it. The statute must, therefore, be

19

> applied and interpreted in a manner, which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it. This is because the rules of statutory construction require that the general intent and purpose of the Legislature in enacting the law must, if possible, be given effect. Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. It is likewise presumed that the intention of the legislative branch is to achieve a consistent body of law.

*McLane Southern, Inc. v. Bridges*, 11-1141, pp. 6-7 (La. 1/24/12), 84 So.3d 479, 483 (internal citations omitted).

It is well-established that the task of statutory construction begins with an examination of the language of the statute itself. *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, (La. 7/1/08), 998 So.2d 16. As the favored remedy in the oppression context, Louisiana affords a shareholder seeking to withdraw from a closely-held corporation on grounds of oppression the right to compel the company to purchase his or her ownership interest. La.R.S. 12:1-1435, *et seq.* Throughout the entire process, the statutory standard of value to which a withdrawing shareholder is entitled is "fair value," which the LBCA defines as

> the value of the corporation's shares determined immediately before the effectuation of the corporate action to which the shareholder objects, using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal, and without discounting for lack of marketability or minority status[.]

La.R.S. 12:1-1301(4). Louisiana Revised Statutes 12:1-1435(C) goes on to provide,

> C. (1) The term "fair value" has the same meaning in this Section and in R.S. 12:1-1436 as it does in R.S. 12:1-1301(4) concerning appraisal rights, except that the value of a withdrawing shareholder's shares is to be determined

as of the effective date of the notice of withdrawal pursuant to Subsection D of this Section.

(2) The context of the transaction requiring appraisal, as described in R.S. 12:1-1301(4), is a sale of the entire corporation in an arm's-length transaction by a person who owns all of the shares in the corporation.

Given the parties' disagreements regarding the value of Mr. Kolwe's interest both at trial and on appeal, we conclude that the meaning of "fair value" by reference to the plain language of the statute is not clear and free of ambiguity. In our view, the term fair value does not have a commonly accepted meaning and is often incorrectly conflated with the term "fair market value." Thus, in interpreting the legislature's intent in purposely selecting fair value as the applicable standard in the context of appraising a shareholder's interest, it becomes necessary for this court to distinguish the colloquial usage of fair market value from that of the legal definition of fair value.

The Louisiana Business Corporation Act (LBCA), La.R.S. 12:1-101 through 1-1705, which the Legislature adopted pursuant to 2014 La. Acts No. 328, § 1, became effective on January 1, 2015. *Cole v. Sabine Bancshares, Inc.*, 17-272 (La.App. 3 Cir. 12/6/17) (unpublished decision). The LBCA repealed and reenacted Chapter 1 of Title 12 of the Louisiana Revised Statutes in order to make the former Louisiana business law consistent with the American Bar Association's Model Business Corporation Act ("Model Act"). *Id.*; La.R.S. 12:1-101; 2014 La. Acts No. 328, § 1.

Moreover, the LBCA has reproduced its definition of "fair value" verbatim from Model Act § 13.01.[11] While the Official Comments to La.R.S.

_____

[11]"Fair value" means the value of the corporation's shares determined:

21

12:1-1301(4) provide little guidance in the way of discerning the legislature's intent in adopting the Model Act's definition of "fair value," Official Comment (2) to the LBCA's identical counterpart, Model Act § 13.01, provides some much desired elucidation. It states that the definition of fair value "is designed to adopt the more modern view that appraisal should generally award a shareholder his or her proportional interest in the corporation *after valuing the corporation as a whole, rather than the value of the shareholder's shares when valued alone*." Mod. Bus. Corp. Act § 13.01, Official Comment (2) (Fair Value) (2010) (emphasis added).

CASE interprets La.R.S. 12:1-1435(C)(2), describing "a sale of the entire corporation in an arm's length transaction by a person who owns all of the shares in the corporation," to envision a literal sale of all of the shares by a 100% shareholder to the corporation itself.[12] Because this transaction would not be agreed to by "any reasonably informed buyer," CASE argues that the trial court's valuation interpreted in this context violates La.R.S. 12:1-1435(C)(2) and 12:1-1301(4). Instead, in order to be "consistent with customary and current valuation concepts and techniques," CASE urges that La.R.S. 12:1-1435(C)(2) requires a valuation to be made in the context of "a hypothetical transaction with a third-party

---

(i)    immediately before the effectiveness of the corporate action to which the shareholder objects;

(ii)    using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

(iii)    without discounting for lack of marketability or minority status[.]

Mod. Bus. Corp. Act § 13.01 (Definitions) (2016).

[12]CASE further argues that such a transaction is "invalid and ineffective as a matter of law" under La.R.S. 12:1-603. However, we decline to extend our interpretation of the relevant provisions to La.R.S. 12:1-603.

buyer." We find that CASE's interpretation of fair value presents two separate, but related, issues. We, therefore, disagree with its reading of the statute.

First, CASE's interpretation of the language, "a sale of the entire corporation. . ." unnecessarily convolutes the context of La.R.S. 12:1-1435(C)(2) into a hypertechnical construction that detracts from the fair value standard set forth by the legislature. It is our view that the context envisioned by the legislature in drafting "a sale of the entire corporation" is that of a dissolution in effect. However, given the legislature's express striking of shareholder oppression as a grounds for corporate dissolution, it appears reasonable that the legislature would choose not to include the term "dissolution" in the shareholder oppression statute so as not to create an apparent inconsistency in the law.

To begin, La.R.S. 12:1-1435(C)(2) is codified under Part 14 of Title 12, Chapter 1, which is entitled "Dissolution." The Official Comments to that statute state:

> (a) Model Act Section 14.34 provides a mechanism under which the corporation or its shareholders may elect to buy out the interests of a shareholder *who is seeking to have the corporation dissolved* under Model Act Paragraph 14.30(a)(2). This Section retains the Model Act approach with respect to dissolution on grounds of deadlock under R.S. 12:1-1430(A)(2)(a) and (c). But, with respect to other grounds for dissolution under R.S. 12:1-1430(A)(2), this Section replaces the Model Act scheme with four entirely new Sections, R.S. 12:1-1435 through 1-1438. As explained in Comment (c), below, the four new Sections provide remedies for a claim under R.S. 12:1-1430(A)(2) only on grounds of oppression. But the main effect of the four new Sections is to reverse the order of the remedies provided by the Model Act for oppression, from dissolution unless the corporation or its shareholders choose quickly to buy out the plaintiff shareholder, to a buyout of the plaintiff shareholder unless the corporation chooses to dissolve before final judgment in the suit is rendered.

> (b) This change in the order of remedies is designed to do two things: allow the corporation to contest the plaintiff shareholder's allegations of oppression without risking an involuntary dissolution of the entire company, and align the statutory remedies for oppression more closely with those that have been provided in most of the reported American cases on the subject.

La.R.S. 12:1-1435, Official Revision Comments (a) and (b) (emphasis added). While we recognize that the Official Comments are not part of the statute, and, thus, are not binding on this court, they provide meaningful guidance in this instance by setting forth the legislature's clear preference for the buyout remedy over that of corporate dissolution. *Terrebonne Parish School Bd. v. Castex Energy, Inc.*, 04-968 (La. 1/19/05), 893 So.2d 789. While the legislature has followed the Model Act's approach in most aspects of its revision of the LBCA, it specifically chose to reverse the order of the Model Act's remedy from "dissolution unless buyout" to "buyout unless dissolution." That is to say, where the Model Act provides that the oppressed shareholder's primary remedy is to seek dissolution of the corporation unless the corporation elects to buyout the shareholder, the LBCA expressly prohibits dissolution on grounds of oppression in favor of its exclusive remedy being the fair value buyout.[13] Therefore, it would seem practical for the legislature not to choose to use the term "dissolution" in La.R.S. 12:1-1435(C)(2). In choosing the phrase "a sale of the entire corporation in an arm's length transaction by a person who owns all of the shares in the corporation[,]" which, in effect amounts to a dissolution, the language clearly

---

[13] Whereas the Model Act generally authorizes a court to offer a range of remedies when oppressive conduct is established in a closely held corporation, La.R.S. 12:1-1435 establishes that a fair value buyout is the exclusive remedy in the oppression context. It provides that, "[w]ithout limiting any remedy available on other grounds, the right to withdraw in accordance with this Section and R.S. 12:1-1436 is the exclusive remedy for oppression." La.R.S. 12:1-1435(L).

reflects the legislature's disfavored (and now defunct) remedy of dissolving the corporation in matters of shareholder oppression disputes.

Despite departing from the Model Act in the context of dissolution, the LBCA has nevertheless aligned its objective more closely with the Model Act's stated purpose of "valuing the corporation *as a whole*" as opposed to valuing the shareholder's shares in and of themselves. In valuing a shareholder's interest "in the context of a sale of the *entire* corporation," the legislature kept consistent with the Model Act's approach of first examining the value of the corporation as whole, as a beginning step in determining the fair value of shares. Hypertechnicalities aside, the danger in CASE's initial misconstruction lies not in its literal impacts, but rather in the implications that follow. To accept CASE's reasoning would erroneously convert the meaning of "fair value" into "fair market value," a separate and distinct standard that directly impacts the valuation of shares.

Following the argument advanced by CASE, we next examine its continued references to a hypothetical transaction—specifically, what a hypothetical buyer of these shares would pay for Mr. Kolwe's shares. On review, we find this logic to be directly antithetical with the legal conception of "fair value." While scholars and commentators in other jurisdictions have wrestled with the meaning of "fair value" over the last few decades, such strife has largely been predicated on the applicability of discounts where the relevant statutory provisions are silent on this issue.[14] Like such jurisdictions which have struggled to correctly define "fair value," CASE's argument illustrates the common, yet erroneous, injection of fair market value principles into the legal definition of fair value where

---

[14] For a more in-depth discussion on the conflicting approaches taken by other jurisdictions, see Douglas K. Moll, *Shareholder Oppression and the New Louisiana Business Corporation Act*, 60 Loy. L. Rev. 461.

the valuation difference between these two approaches is equivalent to the amount, and, thus, the applicability, of discounts.[15]

To begin, "[a] fair market value analysis determines the value of closely held corporation shares by asking what someone would hypothetically pay for those shares." Douglas K. Moll, *Shareholder Oppression and the New Louisiana Business Corporation Act*, 60 Loy. L. Rev. 461, 498 (2014). Because the shares of a minority shareholder in a closely held corporation, such as that of Mr. Kolwe, are marked by a lack of value-enhancing attributes such as control and liquidity, "fair market value" captures the absence of those features by reducing, or "discounting" the purchase price of those shares. *Id*. Therefore, if we accept that fair value is equivalent to fair market value, discounting the buyout price of those shares is appropriate. *Id*.

Unlike the other aforementioned jurisdictions, however, the Louisiana legislature has explicitly resolved this issue by rejecting the applicability of discounts in the context of purchasing a withdrawing shareholder's interest. Not only does the language of the statute expressly disallow discounting, but the legislature's decision to select the term "fair value" rather than "fair market value" carries the implicit rejection of discounting. As one scholar has explained, fair value may be equated with "enterprise value," which at the outset, views the shareholder in an oppression-induced buyout transaction "as an investor forced to relinquish his ownership position, rather than as an investor looking to sell his shares." *Id*. at 499. In this view, the fair value of shares "is determined not by reference to what the particular shares would fetch in a hypothetical market sale,

---

[15]In its brief on appeal, CASE even referred to the standard definition of "fair market value" in stating that this definition is consistent with "customary and current valuation concepts and techniques" under La.R.S. 12:1-1301(4).

but instead by valuing the company *as a whole* and by ascribing to each share its pro rata portion of that overall enterprise value." *Id.* Thus, the shares of a minority shareholder are not valued in and of themselves, but rather as a part of the overall value of the corporation with no discounting for the shares' lack of valuable attributes. *Id.*

In its decision to choose "fair value" as its standard, which in and of itself both explicitly and implicitly rejects discounting, the Louisiana legislature has explicitly resolved this issue in favor of expressly rejecting the applicability of discounts in calculating the fair value of a withdrawing shareholder's interest in the corporation. Thus, shares of a withdrawing shareholder in the context of La.R.S. 12:1-1435, *et seq.* must be valued in accordance with the general rule that rejects discounting.

Accordingly, we hold that the term "fair value" in the context of Louisiana's shareholder oppression statute means the withdrawing shareholder's proportionate interest in the corporation valued as a going concern. Thus, in order to ascertain "fair value," the trial court must first determine the value of the corporation in its entirety and then allocate the withdrawing shareholder his proportionate ownership interest of that value, without applying any discounts at the shareholder level.

Tax-Effecting

In its determination of the value of Mr. Kolwe's interest, the trial court concluded that,

> CASE argues that the failure to apply tax-effecting will
> result in the remaining two CASE shareholders incurring
> an obligation to pay income taxes on income that the
> plaintiff received. However, CASE failed to present any

27

> evidence to support that conclusion. There was no evidence presented that this judgement [sic] will cause any tax effect on the parties. In fact, the logic of CASE's argument suggest [sic] any reduction of the valuation for tax-effecting would result in a discount for the two remaining shareholders and double taxation for the plaintiff; therefore, this court finds that tax-effecting the unaccrued net assets is inappropriate in this case.

Under this interpretation, which is also espoused by Mr. Kolwe, to tax-effect the net assets of the corporation in determining the fair value of a withdrawing shareholder's interest results in a discount. As we previously explained, this is expressly prohibited in valuing a minority shareholder's interest under La.R.S. 12:1-1435.

Tax-effecting is a method whereby an appraiser fictitiously reduces the earnings stream, and, thus, the value, of a pass-through entity to account for a hypothetical entity-level income tax where such entities are not subject to taxation. CASE is incorporated as an S-corporation, and is, thus, not subject to corporate-level tax. Instead, taxes are passed through to the individual shareholders on the personal level to be reported as income tax. Every year, each shareholder receives a K-1 form reporting all income received by him or her individually for that year, and taxes are to be paid on the amount reported as income. CASE operates on a cash basis, meaning that its accounts receivable, which comprise its unaccrued net assets, are taxed when collected, not when earned. Therefore, until the receivables are realized as income, these earnings are not yet subject to taxation. However, the decision of whether to tax-effect S-corporations is an ongoing debate among the business valuation profession.[16]

---

[16]We note that Mr. MacMorran correctly and succinctly testified as to this ongoing debate:

As the jurisprudence of this state has illustrated, expert testimony in cases involving the valuation of interests in a business entity is critical.

> Generally, the trier of fact is not bound by expert testimony, but is to hear and weigh expert testimony in the same manner as any other evidence. Reasonable and well-founded opinion should be considered. The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and especially on the facts which that expert's opinion is based.

> The fact-trier is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. The effect and weight to be given the expert's testimony depends upon the validity of the underlying facts relied upon by the expert, and rests within the broad discretion of the trial judge.

*Head v. Head*, 30, 585 (La.App. 2 Cir. 5/22/98), 714 So.3d 231, 234. Moreover, in analogizing to the community property context in which courts of this state must routinely value the assets and liabilities of the community upon termination, we likewise find that where the "asset to be valued is an interest in a partnership or corporation, the court must be careful to value the interest, not just the assets of the business entity" upon a shareholder's withdrawal on grounds of oppression. *Ellington*, 842 So.2d at 1166.

---

The debate is not about whether income taxes exist at a C Corporation company or S Corporation shareholder level. Those taxes exist. Somebody pays them. The debate is about how do you account for the fact that C Corporations are double taxed, meaning they pay corporate income tax and they pay dividends. S Corporations pay corporate level tax at the shareholder level but they're not taxed on their dividends.

For a more in-depth discussion on the jurisprudential development of tax-effecting in the United States, *see* Daniel Tinkelman, *et al*, *Sub S Valuation: To Tax Effect, or Not to Tax Effect, is Not Really the Question*, 65 Tax Law 555, 561 (2012).

The fair value of a withdrawing shareholder's interest may be determined by employing several approaches.[17] Here, the experts agreed that the proper approach to be employed in this case was the "net asset approach," which relies on valuing separately the individual assets and liabilities of the company and assumes the highest value is achieved through breaking up the company.[18] However, the experts ultimately disagreed on the applicability of tax-effecting in this case.

At the valuation trial, the trial court was able to weigh the conflicting testimony presented by Mr. Theriot and Mr. MacMorran as to the applicability and impact of tax-effecting the value of CASE's accounts receivables. Mr. Theriot, the valuation expert for Mr. Kolwe, opined that tax-effecting was inappropriate here. In his valuation, Mr. Theriot first appraised CASE in its entirety to testify that one-hundred percent interest in CASE was worth approximately $2.6 million, and divided that figure by the total number of shareholders to determine that Mr. Kolwe's one-third interest in CASE was worth approximately $871,000.00. He declined to tax-effect the $871,000.00 figure to account for the accrual of tax liability because Mr. Kolwe remained a shareholder throughout 2017 and will nevertheless remain liable for taxes on the income received throughout that tax year. Mr. Theriot premised his argument on the fact that as the buyer of Mr.

---

[17] In again noting that the LBCA's definition of "fair value" has been identically reproduced from § 13.01 of the Model Act, Official Comment 2(B) provides guidance in stating that the definition "adopts the view that different transactions and different contexts may warrant different valuation methodologies. Customary valuation concepts and techniques will typically take into account numerous relevant factors, and will normally result in a range of values, not a particular single value."

[18] In our independent review, we find that this approach is consistent with our interpretation of the legal conception of "fair value." For an extended discussion on the different approaches to valuation, *see* Daniel Tinkelman, *et al*, *Sub S Valuation: To Tax Effect, or Not to Tax Effect, is Not Really the Question*, 65 Tax Law 555, 561 (2012).

Kolwe's shares, CASE is not subject to any corporate-level taxation where its tax liability is passed-through to the shareholders who report that income on their personal tax returns according to its S-corporation status. Therefore, because CASE itself will not assume any future tax liability in purchasing Mr. Kolwe's shares where taxes are owed on the shareholder level, Mr. Kolwe will remain liable for his share of the corporation's tax liability for as long as he remains a shareholder and receives a K-1 reporting item.

Conversely, Mr. MacMorran, the valuation expert for CASE, argued that notwithstanding CASE's status as an S-corporation, the taxes will have to be paid by someone. In premising his argument on what a "hypothetical buyer" would pay for Mr. Kolwe's shares, as examined in the previous section, he testified that "[t]hey would not pay after-tax dollars to acquire pretax assets that they have to turn around and pay tax on again the next day. That would be a double-dip in valuing the shares." Thus, Mr. MacMorran ultimately argued that the issue was not only whether the corporation itself will pay taxes, but also whether a hypothetical buyer would pay taxes once the receivables were collected, thereby reducing the value of those receivables to the buyer. In concluding, a hypothetical buyer of shares in a pass-through entity will owe taxes upon collection of the receivables, and, thus, Mr. Kolwe's shares should be discounted to reflect that reduction in value.

Ultimately, business valuation methods are not an exact science, and serve as guides to the trial court in determining fair value for the parties involved. *See Vedros v. Vedros*, 16-735 (La.App. 5 Cir. 10/25/17), 229 So.3d 677. Here, the valuation determination was made for the purpose of evaluating the fair value of Mr. Kolwe's shares in CASE as a shareholder exercising his right to withdraw.

However, in light of our interpretation of "fair value," we cannot say that the trial court abused its discretion in its determination to not tax-effect the value of the corporation's receivables, nor that it committed manifest error in considering the expert testimony of both Mr. MacMorran and Mr. Theriot in reaching its conclusions. Accordingly, we affirm the trial court's valuation determinations.

BP Settlement Payment

In November of 2013, CASE submitted a claim to the BP Settlement Fund in the amount of approximately $126,000.00. In either January or February of 2017, CASE received $105,000.00 from that claim, and subsequently collected a net amount of approximately $95,000.00 after deducting preparation expenses. Both experts agreed that the amount received for the claim could be included in the valuation if it comported with certain accounting standards, or was "known or knowable as of the valuation date" which has been established as November 29, 2015. In fact, it was adduced at the trial that Mr. MacMorran's accounting firm handled the administration of the BP claim. However, the experts disagreed as to what aspects of the claim were known or knowable as of the valuation date in determining whether the claim proceeds should be included in the valuation.

In providing expert testimony on behalf of Mr. Kolwe, Mr. Theriot included the BP claim in his valuation because he considered it an asset of the company as of November 29, 2015, the effective date of Mr. Kolwe's withdrawal and, thus, the date his shares were to be valued. In applying the relevant accounting standards, Mr. Theriot testified that so long as the receipt of proceeds subsequent to the valuation date are "corroborative" of a fact that was "known or knowable" as of the withdrawal date, then he is permitted to consider those

proceeds in his valuation. However, Mr. Theriot acknowledged that corroborating a fact may not serve to establish a fact, the fact here being "the incident had occurred, the settlement had been reached, the claim had been filed, there was just a question of approval of that claim." While CASE did not know of the claim's approval until early 2017, the settlement itself set forth all of the criteria that needed to be met, the parties supplied all the relevant documentation, and there were no additional requests made of CASE as of November 29, 2015.

On the other hand, Mr. MacMorran testified that as of November 29, 2015, there was no known dollar amount and no known date of payment. Because the amount that was to be eventually received from the settlement had not been approved as of the valuation date, Mr. MacMorran testified that the BP claim was not known or knowable and, thus, should not have been included in the valuation.

At the conclusion of the valuation trial, the trial court determined that the value of the proceeds of the settled BP claim was to be included in the valuation of Mr. Kolwe's shares. It held:

> In 2017, CASE received settlement proceeds of a BP claim that had been accepted as of the date of plaintiff's withdrawal. The parties dispute whether this subsequent event should be included in the valuation of plaintiff's shares in the corporation. Subsequent events should not be considered in the valuation decision if those subsequent events are indicative of conditions that were not known or knowable at the valuation date, including conditions that arose after the valuation date. The parties testified that the BP claim was made prior to the withdrawal date. Thus, this court finds that asset was in fact known and a value of that asset was knowable. There was no evidence presented that the settlement value that was ultimately obtained was not knowable. . . The plaintiff's explanation of the [sic] how that value was knowable was clear and convincing[.]

Again, the trial court's weighing of the expert testimony and its ultimate decision to include the BP claim proceeds in the valuation of Mr. Kolwe's shares in CASE are subject to a review for abuse of discretion, and in the absence thereof, we shall afford great deference to the trial court's determination. While an exact dollar figure of the BP claim was not approved as of the valuation date, the completed settlement proceedings as of that date indicate that a forthcoming payment of the claim to the corporation was at least knowable, and, thus, we do not find that the trial court abused its discretion in accepting Mr. Theriot's opinion over that of Mr. MacMorran's in its valuation determination.

## Judicial Interest and Costs

Judicial Interest

On appeal, Mr. Kolwe asserts that the trial court legally erred in failing to award legal interest from the date of judicial demand. Though both the Original and Amended Judgments assessed costs of the valuation proceedings to CASE, it remained silent regarding judicial interest.

In response to Mr. Kolwe's assertion, CASE now files a Peremptory Exception of *Res Judicata* and also moves this court for a partial dismissal of Mr. Kolwe's appeal to the extent it seeks interest and costs. Specifically, the corporation argues that because the Consent Judgment and Order of Trial Date signed by the trial court on July 12, 2017, dismissed with prejudice all claims and demands except those not reserved by the parties, CASE argues that the doctrine of *res judicata* bars this court from re-litigating the issue given Mr. Kolwe's failure to reserve interest and costs in the Consent Judgment itself.

34

While Mr. Kolwe concedes that La.R.S. 12:1-1435, *et seq.* does not explicitly address awards of judicial interest, he maintains that because his original Petition filed April 6, 2016 included a prayer for judicial interest, he is, thus, entitled to recovering such notwithstanding his failure to reserve any such entitlement in the Consent Judgment. Louisiana Code of Civil Procedure Article 1921 provides that "[t]he court shall award interest in the judgment as prayed for or as provided by law." Our review of the record reveals that Mr. Kolwe did in fact pray for judicial interest in his original Petition filed on April 6, 2016.

As CASE correctly points out, La.R.S. 12:1-1435 does not expressly provide Mr. Kolwe with a positive statutory right to recover interest as a withdrawing shareholder. However, we find the preceding statute, La.R.S. 12:1-1434, which governs the corporation's election to purchase a petitioning shareholder's interest in lieu of a dissolution proceeding, to be sufficiently analogous to the instant case in allowing interest to a shareholder who is nevertheless departing from the corporation, albeit on different grounds. While not controlling, the statute provides some additional support for our position:

> Upon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate. . . . Interest may be allowed at the rate and from the date determined by the court to be equitable, but if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed.

La.R.S. 12:1-1435(E). This case, which has in fact resulted in a judicial determination of the fair value of Mr. Kolwe's shares, is similar enough to the preceding statutory provision that we find it appropriate to reason by analogy that an award of interest is allowable here. We, thereby, allow Mr. Kolwe to recover

judicial interest as a withdrawing shareholder in the absence of any showing of bad faith on his part in the valuation proceedings.

In determining the date from which interest is due, however, we do not agree with Mr. Kolwe's assertion that he is owed interest from the date of judicial demand. Louisiana Civil Code Article 2000 provides, in pertinent part,

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more.

Instead, we find it instructive to view the Consent Judgment as the conventional obligation ordering that the valuation trial be held, at which the parties understood that the trial court would determine the fair value of Mr. Kolwe's shares which would be owed by the corporation.

> A consent judgment is a bilateral contract in which parties adjust their differences by mutual consent and thereby put an end to a lawsuit with each party balancing hope of gain against fear of loss. La.Civ.Code art. 3071; *Plaquemines Parish Government v. Getty Oil Co.*, 95-2452 (La. 5/21/96); 673 So.2d 1002. "A judgment, whether it results from the assent of the parties or is the result of a judicial determination after a trial on the merits, is and should be accorded sanctity under the law." *Id*. at 1006.
>
> . . . .
>
> Although it has the same binding force, a consent judgment is not one rendered by a trial court as a result of a trial on the merits. A consent judgment has binding force from the presumed voluntary acquiescence of the parties and not from adjudication by the trial court.
>
> *Deville v. Rapides Area Planning Com'n*, 97-1437, p. 9 (La.App. 3 Cir. 6/17/98), 715 So.2d 577, 580-81, *writ*

*denied*, 98-1943 (La. 10/30/98), 727 So.2d 1167; *Peeler v. Dural*, 06-936 (La.App. 5 Cir. 4/11/07), 958 So.2d 31.

*Thomas v. Thomas*, 17-295, p. 6 (La.App. 3 Cir. 11/22/17), 234 So.3d 950, 954-55 (quoting *Fitzgerald v. Fitzgerald*, 09-1259, pp. 2-3 (La.App. 3 Cir. 4/7/10) (unpublished opinion)).

The obligation to give a sum of money here arose by virtue of the parties entering into the Consent Judgment, a conventional obligation; thus, interest on that sum will begin to run from the time that obligation becomes due rather than the date of judicial demand.[19] Therefore, we find it appropriate to award interest from the time CASE's obligation to pay Mr. Kolwe the fair value of his shares became due, being the date the trial court rendered its final judgment in the valuation trial on December 22, 2017.

Costs

CASE additionally argues on appeal that the trial court erred by assessing costs against it in both the Original and Amended Judgments. We disagree. Louisiana Revised Statutes 12:1-1331, which governs court costs and expenses arising from the judicial appraisal of shares, explicitly provides that

> *The court shall assess the court costs against the corporation*, except that the court may assess court costs against all or some of the shareholders demanding appraisal, in amounts which the court finds equitable, to the extent the court finds such shareholders acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this Part.

La.R.S. 12:1-1331(A) (emphasis added).

---

[19]"When the obligation to give a sum of money is conventional, that is, when it arises from a contract, that sum is due at the arrival of the term for that purpose provided in the agreement." 6 La. Civ. L. Treatise, Law of Obligations § 9.7 (2018)

Therefore, in the absence of any evidence demonstrating a finding of bad faith on the part of Mr. Kolwe, we cannot say that the trial court erred in assessing costs of the valuation proceeding to CASE. CASE's Peremptory Exception of Res Judicata is denied.

### Proffering Evidence Under La.R.S. 12:1-1436(E)

On appeal, CASE asserts that La.R.S. 12:1-1436(E) required the trial court to reduce the amount it was ordered to pay Mr. Kolwe for his shares pursuant to the final judgment. Despite the fact that CASE brought the statute to the trial court's attention in opening argument and twice more before closing arguments, as well as proffered testimony of its financial condition after the trial, it maintains that the trial court erroneously excluded the evidence it sought to present pertaining to the statute. Further, it argues that the statute should allow for bifurcated process to include an evidentiary hearing following the trial court's determination of fair value. While the latter presents a compelling policy argument, we cannot find that the trial court abused its discretion in its taking of evidence.

Louisiana Revised Statutes 12:1-1436(E) provides:

> If at the conclusion of the trial the court finds that the corporation has proved that its payment of the judgment rendered in accordance with Subsection D of this Section would violate a limitation or requirement as described in R.S. 12:1-1435(I) or cause undue harm to the corporation or its creditors, the court shall render a final judgment that, by itself or in conjunction with earlier orders or partial judgments of the court, provides relief as close in value and effect as feasible to that contemplated by Subsection D of this Section, but adjusted as necessary to avoid the relevant violation or undue harm.

While CASE attempts to argue that La.R.S. 12:1-1436(E) "requires reduction of the judgment amount," a plain reading of this statute reveals that, first

and foremost, any adjustment to be made to the judgment is purely within the trial court's discretion. Moreover, the statute clearly conditions this discretionary adjustment of the judgment amount upon its satisfaction that the corporation has adequately proven that its payment of the judgment will either violate rules pertaining to a corporation's acquisition of its own shares or cause some undue harm. Thus, if and only if the corporation has sufficiently demonstrated either of these aspects before the trial court, the court may adjust the judgment as necessary to avoid that result.

We find that nothing in the statute "necessitates" a "reduction" in the amount, *per se*, as CASE argues. If so convinced at the conclusion of the valuation trial, the trial court in its discretion may provide relief "as close in value and effect as feasible to that contemplated by Subsection D . . . but adjusted as necessary to avoid the relevant violation or undue harm." La.R.S. 12:1-1436(E).

Despite acknowledging that the statute clearly and explicitly "calls for its application 'at the conclusion of trial,'" CASE argues that the normal order of trial should have been varied to allow for an evidentiary hearing and/or a reopening of the record. In light of the clear language of the statute, and finding that CASE did in fact have several opportunities to present evidence pertaining to the application of the statute by the conclusion of the valuation trial, we do not find CASE's argument to this point compelling.

We also find CASE's assertion that the trial court erroneously excluded evidence pertaining to La.R.S. 12:1-1436(E) meritless. In its opening statement, counsel for CASE mentioned the statute before the trial court in an explicit effort to bring the statute to the court's attention. Before the close of Mr.

Kolwe's rebuttal, counsel for CASE again read the statute before the court and stated,

> My point is that it looks like the statute is calling for us to know what the judgment rendered is going to be so we can put on evidence of whether the corporation can pay the judgment or not. And I just want to know procedurally how we do that.

Following a recess at which the trial court reviewed the statute, it stated on the record:

> I have now had an opportunity to read Revised Statute 12:1-1436, and it appears that the particular paragraph that is of note is paragraph E. And my interpretation of that paragraph is that if during the course of this trial I determine that the value of the plaintiff's share is $300, that is what the evidence convinces me, and also there has been evidence presented during the course of the trial that convinces me that if I order the corporation to pay any amount more than $200, if that will cause undue harm to the corporation or to a creditor to the corporation, then I'm not allowed to render the $300 judgment, I'm required to reduce the $300 judgment to something not more than $200. That is what the statute says.
>
> The evidence that's already been presented, there is no evidence that causes me to be able to conclude that undue harm of a judgment of any amount would result – there's no evidence that would cause me to conclude that any judgment I render today will produce undue harm to this corporation or to any of its creditors. There has not been that evidence presented. So I don't think that that paragraph has any bearing on anything we're doing today.

CASE's assertion that a reduction in the judgment is required is simply untenable where the ultimate condition giving rise to the trial court's exercise of discretionary relief was not fulfilled, that is, the corporation's ability to present proof or otherwise convince the trial court that it will suffer a violation or undue harm in its payment of the judgment.

After resting its case but before closing arguments, CASE moved to reopen the record for purposes of introducing evidence pertaining to La.R.S. 12:1-1436(E). Citing several appellate cases as well as codal authority, CASE argued that the trial court had discretion to reopen the record and that it ought to do so in this case in order to allow for "ascertainment of the truth" pursuant to La.Code Evid. art. 611.[20]

In ruling on the motion, the trial court examined all of the jurisprudence presented and determined that CASE "made a calculated decision to not present evidence that was available." It further stated that CASE had "not given [the trial court] sufficient reason to exercise the discretion that [it has] to allow you to reopen this case to present evidence." In light of what we find to be sound reasons enunciated throughout the valuation trial by the trial court, we are reminded that this is ultimately an evidentiary determination of the trial court that

---

[20]CASE also urged that if the court did not exercise its discretion in reopening the record that it would be "precluded from offering that evidence, and also would not have the ten-year payment plan available that was available under the old statutes, but that would be a miscarriage of justice and would be a shield of the truth, which is what the rules are designed to prevent against."

We note here that the pre-revision version of La.R.S. 12:1-1436(E) allowed for a trial court to order full payment of the judgment through an unsecured promissory note due in ten years. Moll, 60 Loy. L. Rev. 461 at 497. Prior to January 1, 2015, the court had the option to render a final judgment "[o]rdering the corporation to issue and deliver to the shareholder within thirty days of the date of the judgment an unsecured negotiable promissory note of the corporation." The note was to be in a principal amount equal to the fair value of the shares, and it must have provided for simple interest "at a floating rate equal to the judicial rate of interest." The note may have had a term of up to ten years, and it may have contained "such other terms, customary in negotiable promissory notes issued in commercial transactions, as the court may order." The judgment must have also provided that the seller's ownership is terminated "upon delivery to the shareholder of the note." *Id.* at 496.

While the LBCA as revised provides less flexibility to courts in structuring a fair value buyout, the legislature decidedly chose to exclude this option in the revision. Perhaps an unfortunate reality for Louisiana corporations finding themselves in buyout transactions after the revision, the drafters' exclusion of the option reflects a clear policy decision that we must uphold in stating the law.

is accorded considerable discretion by this court. While the procedure set forth in La.R.S. 12:1-1436(E) is considerably new, our supreme court has noted,

> [S]everal of the most important reasons for deferring to the trial judge's exercise of discretion are: his observation of the witness, his superior opportunity to get "the feel of the case," . . . and the impracticability of framing a rule of decision where many disparate factors must be weighed . . . . On occasion, when a problem arises in a context so new and unsettled that the rule-makers do not yet know what factors should shape the result, the case may be a good one to leave to lower court discretion.

*Kem Search, Inc.*, 434 So.2d at 1071 (La.1983) (internal citations omitted). As such, we find the trial court has not abused its discretion in denying the motion to reopen the record, nor in ultimately determining that CASE did not sufficiently prove that its payment of the judgment would cause a violation or undue harm under La.R.S. 12:1-1436(E). Therefore, its decisions with respect to the statute will not be disturbed on appeal.

V.

**CONCLUSION**

Based upon the foregoing, the final judgment of the trial court rendered on December 22, 2017, valuing Mr. Kolwe's shares to be worth $871,817.00 is affirmed as amended. While Mr. Kolwe's shares were valued as of the effective date of his withdrawal from CASE on November 29, 2015, his obligations, rights, and duties as a shareholder of the corporation are deemed to have terminated as of December 22, 2017. Mr. Kolwe is hereby entitled to legal interest on the judgment valuing his shares as of the date CASE's obligation to pay him the fair value of his interest became due, which is the date of the final

42

judgment rendered on December 22, 2017. Costs of this appeal are assessed to Defendant, Civil and Structural Engineers, Inc.

**AFFIRMED AS AMENDED.**